**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ANDREW BROWN, and HC COMPOSITES L.L.C.,** | **CIVIL ACTION NO.  26-CV-475** |
| **Plaintiff,** | **JURY TRIAL DEMANDED** |
| **v.** | |
| **BINSWANGER MANAGEMENT CORP., and DAVID BINSWANGER,** | |
| **Defendants.** | |

**COMPLAINT**

AND NOW, come the Plaintiffs, ANDREW BROWN ("Brown") and HC COMPOSITES LLC, INC. ("HC Composites"), (collectively, "Plaintiffs"), by and through undersigned counsel, alleging as follows against Defendants BINSWANGER MANAGEMENT CORP. and DAVID BINSWANGER (collectively, "Defendants" or "Binswanger").

**PRELIMINARY STATEMENT**

1.      This action seeks to redress Defendants' flagrant abuse of the judicial system and their wrongful use of civil proceedings as a weapon of coercion rather than as a means to resolve legitimate disputes.

2.      As detailed below, Binswanger knowingly weaponized the judicial process by filing a patently baseless lawsuit against HC Composites L.L.C. and its owner, Andrew Brown, individually, among others, all purportedly arising from HC Composites' September 18, 2020 purchase of a land site with building improvements (the "Property") in Greenville, North Carolina ("the underlying action").

3.      In the underlying action, Defendants falsely claimed they were entitled to a six percent (6%) real estate commission, or a sum in excess of $300,000.00, in connection with the sale of the Property, even though Binswanger had never obtained the written contract required by North Carolina law that would permit recovery of a commission, and HC Composites had already legally engaged its own broker.

4.      Defendants' lawsuit was not commenced to obtain a legitimate adjudication on the merits. Rather, it was pursued for improper purposes, including bullying, harassing, intimidating, and pressuring Brown and his company into paying money Defendants knew they were not entitled to receive.

5.      Defendants' lawsuit culminated in a bench trial on October 24, 2022, before the Honorable Steven R. Warren. After considering the trial evidence and post-trial submissions, Judge Warren concluded that Binswanger's claims were frivolous, malicious, and brought without any basis in law or fact. See Exhibit A (Order of the Honorable Steven R. Warren, Special Superior Court Presiding, dated November 7, 2022) (the "Judgment").

6.      In a separate opinion, the Court sanctioned Binswanger and ordered them to pay over $100,000 in attorneys' fees and costs, finding that their conduct was "wholly irresponsible, reckless, frivolous, and malicious." See Exhibit B (Order on Motion for Attorneys' Fees, December 13, 2023, at 14, ¶ 13). Further, the Court ruled that Defendants "knew or should have known" that its civil action against Plaintiffs was "frivolous and malicious" (Exhibit B at 9, ¶ 43) and that the claims against Brown personally were "per se frivolous and malicious." (Exhibit B at 3, ¶ 4).

7.      This action seeks to hold Defendants accountable for their flagrant abuse of the legal system, to compensate Plaintiffs for the substantial harms caused by Defendants' conduct,

and to deter Defendants from continuing a pattern and practice of employing litigation as a business tactic to pursue commissions they did not earn and were never legally entitled to recover.

## THE PARTIES

8.      Plaintiff Andrew Brown is a citizen of North Carolina.

9.      HC Composites LLC is a limited liability company organized under the laws of North Carolina. Each and every member of HC Composites LLC is a citizen of North Carolina.

10.     Defendant Binswanger Management Corp. is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania.

11.     Defendant David Binswanger is a resident of Philadelphia and a citizen of the state of Pennsylvania.

12.     At all relevant times, David Binswanger served as President and Chief Executive Officer of Binswanger Management Corp.

13.     David Binswanger was directly involved in, had knowledge of, approved, encouraged, and consented to the decisions to initiate and continue the baseless litigation against Brown individually, including the assertion of claims for Unfair and Deceptive Trade Practices, quantum meruit, unjust enrichment, and civil conspiracy.

14.     David Binswanger stepped outside his legitimate role as a company executive when he directed the filing of a lawsuit which he knew or should have known was frivolous and prosecuted with malice.

15.     By knowingly authorizing, approving, and directing the filing and prosecution of frivolous and malicious claims against Brown individually, David Binswanger engaged in individual tortious conduct for which he is personally liable, separate and apart from any corporate role or authority.

## JURISDICTION AND VENUE

16.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a).

17.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2).

18.     The wrongful conduct alleged in this action was conceived, authorized and directed at the highest levels of Binswanger's corporate leadership in Pennsylvania.

19.     Senior executives and ultimate decision-makers, operating from Defendants' registered offices in Philadelphia, exercised centralized control over the decision to initiate, escalate, and maliciously prosecute litigation against Plaintiffs, including the deliberate decision to target Andrew Brown personally with claims Defendants knew were legally barred and factually unsupported.

20.     Because the misconduct at issue here flowed from centralized corporate decision-making rather than local discretion, Defendants named in his action are the primary actors responsible for the abuse of process alleged herein, and completely relief may be afforded without the presence of any additional entity.

## JURY DEMAND

21.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a jury trial on all issues so triable.

## STATEMENT OF FACTS

**Andrew Brown, HC Composites and the World Cat Brand**

22.     Brown is the owner and President of HC Composites LLC, the manufacturer of "World Cat" power catamarans.

23.     Brown and his business partner spent over two decades creating HC Composites as a company and building the unequaled value associated with the World Cat brand name.

24.     Under Brown's management over a twenty-year period, HC Composites grew as a North Carolina company to become the largest manufacturer of fiberglass power catamaran boats in the world, with models ranging from 23 feet to 40 feet in length.

25.     Today, World Cat manufactures over 350 boats per year and employs over 300 individuals in North Carolina, with boat sales through dealerships throughout the United States and in foreign countries.

26.     Brown, through his many years of tireless efforts along with many World Cat team members, created the value of the reputation of the World Cat brand, as well as the importance of his personal reputation in serving as the President of HC Composites and the personal representative of the company's leadership to customers purchasing World Cat boats.

27.     As the Court found, "Brown and Brockway spent over two decades of their lives in creating a storied history and unsurpassed quality of HC Composites as a company and the unequalled value associated with the World Cat brand name.... Brown, through his many years of tireless efforts along with many World Cat team members, created the value of the reputation of the World Cat brand, as well as the importance of his personal reputation in serving as the President of HC Composites and the personal representative of the company's leadership to customers purchasing World Cat boats. The conduct of Brown and Brockway incident to the purchase of the property in question, including but not limited to their interaction with the defendant was transparent, above board, ethical, and thoroughly honest throughout." (Exhibit A at 28, ¶ 61).

**Plaintiffs Purchase the Property to Build a New Manufacturing Facility**

28.     In or about 2020, World Cat prepared to introduce a forty-foot (40') catamaran model.

29.    Construction of this larger, wider, and taller model of boat required the acquisition of land and buildings which would be outfitted to serve as a new manufacturing facility focusing on construction of the new boat model.

30.    On September 18, 2020, HC Composites acquired the Property from Camping World Property, Inc. for that purpose.

31.    The Property was located in Greenville, North Carolina, and consisted of a land site with a 200,000 square foot building and office that was then refitted to serve as a factory.

**Binswanger's Limited Involvement and Failure to Secure a Contract**

32.    Binswanger is a real estate brokerage firm headquartered in Philadelphia, Pennsylvania.

33.    Binswanger introduced World Cat to Camping World during the February to April 2020 timeframe.

34.    Binswanger obtained permission from Camping World to show one property to World Cat.

35.    World Cat declined to pursue that property shown by Binswanger.

36.    Subsequently, Camping World and World Cat went on to discuss a different property—the Property that was ultimately purchased on September 18, 2020.

37.    In connection with that acquisition, HC Composites retained Michael Overton of the Overton Group as its own licensed broker.

38.    Overton is a commercial real estate broker with vast transactional experience in the Greenville area.

39.    Overton's family had previously owned a well-known North Carolina business which was founded in Greenville and operated from the Camping World properties prior to their

sale to Camping World, giving Overton extensive knowledge of the Property and its history. (Exhibit A at 8, ¶ 17).

40.     Chris Brockway, HC Composites' Vice President of Manufacturing, initiated contact with Overton because their children played together on a school sports team, and because of Overton's extensive family background with the buildings and his history of conducting business in the city of Greenville and Pitt County. (Id. at 23, ¶ 49).

41.     Brown approved the decision to hire Overton for the same reasons.

42.     HC Composites and the Overton Group executed a written Exclusive Buyer/Tenant Representation Agreement on June 12, 2020, which provided for a two percent (2%) commission to Overton acting as the buyer's exclusive agent. (Id. at 23, ¶ 50).

43.     HC Composites agreed to pay Overton a commission of approximately two percent (2%), or roughly $100,000.00 for brokerage services, and ultimately paid the Overton Group a fee of $110,000. (Exhibit A at 25, ¶ 52).

44.     Overton coordinated the important due diligence activities of HC Composites beginning in the middle of June 2020 and continuing this work through closing of the sale on September 15, 2020, work that was extensive, detailed, and took hundreds of hours to complete. (Id. at 24, ¶ 51).

45.     Overton's work was critical to the success of the purchase between HC Composites and Camping World, and the sale of the Staton Road property from Camping World to HC Composites would not have happened if it had not been for Overton's assistance. (Id. at 24, ¶ 51).

46.     Brown acted solely in his corporate capacity in connection with these decisions.

47.    The conduct of Brown incident to the purchase of the Property, including his interaction with Binswanger, was transparent, above board, ethical, and thoroughly honest throughout.

48.    Binswanger never provided a written disclosure for working with a real estate agent to either Camping World or HC Composites. (Id. at 26, ¶ 53).

49.    Binswanger never provided a representation agreement or a fee proposal to either Camping World or HC Composites. (Id. at 26, ¶ 54).

50.    Binswanger never obtained a signed representation or fee agreement from either Camping World or HC Composites. (Id.).

51.    HC Composites never signed a retention agreement, non-circumvent agreement, or any other form of consulting or services agreement with Binswanger. (Id. at 26, ¶ 55).

52.    Binswanger never secured a written contract for a real estate sale from either Camping World or World Cat.

53.    The Court found that all of Brown's communications with Binswanger during the February to April timeframe were direct and transparent, that Brown never attempted to contact Camping World during this time, and that Brown never requested any additional work, service, or consultation from Binswanger in connection with HC Composites' evaluation of its property needs. (Exhibit A at 15, ¶ 33).

54.    Binswanger was not involved in the subsequent work done by the licensed broker for the Property that was actually purchased.

55.    Binswanger did not negotiate the purchase price or any material terms of sale, and did not participate in discussions regarding the structure, timing, or conditions of the transaction.

56.    Binswanger did not prepare, transmit, or assist with any offers, counteroffers, letters of intent, contracts, or other transactional documents.

57.    Binswanger did not participate in, attend, or assist with the closing and played no role in bringing the sale to completion.

58.    All substantive work required to procure, negotiate, diligence, and close the transaction was performed by HC Composites, Andrew Brown acting solely in his corporate capacity, and HC Composites' retained licensed broker.

**Defendants' Knowledge That They Had No Lawful Entitlement to a Commission**

59.    At the time Defendants initiated the underlying action, they knew they had no written agreement with HC Composites or Brown.

60.    Defendants knew they had no written agreement with Camping World.

61.    Defendants knew they had no procuring-cause involvement in the sale of the Property.

62.    Defendants knew they had no lawful entitlement to any commission.

63.    Defendants knew that, under North Carolina law, the absence of a written brokerage agreement barred any recovery whatsoever.

64.    As the Court concluded, "Binswanger is barred by the North Carolina General Statutes, and in particular G.S. 93-13, from recovering any real estate commission from the Defendants in the absence of a valid written contract between Binswanger and the Defendants." (Exhibit A, at 35, ¶ 20).

65.    The Court found that there is no credible evidence that six percent (6%) would have been accepted by either the buyer or seller, even if Binswanger had later been hired by either party

to act as their agent, and that a six percent (6%) commission was a proposal made by Binswanger one time, in one email, and that fee was never negotiated or accepted by anyone. (Id. at 9, ¶ 20).

66.     As the Court stated, "The Defendants acted in a reasonable and ethical manner. Only Binswanger failed to follow any part of North Carolina law on real estate contracts." (Exhibit B at 8, ¶ 40).

**Defendants' Calculated Plan to Name Brown Individually and Force a Settlement**

67.     Binswanger and its executive management knew that Andrew Brown was acting solely on behalf of HC Composites, the company he founded and spent his adult professional life building, yet deliberately named Brown individually as a defendant.  Defendants made this decision not for any lawful purposes, but rather, to maximize pressure and coerce a settlement.

68.     As the Court found, "Binswanger's knowledge at the initiation of the instant civil action, as well as the greater weight of the credible and substantial record evidence, show that Binswanger and Faris understood that the subject transaction involved HC Composites' acquisition of a corporate asset, and that Brown's involvement in that transaction was due to his employment and ownership interest with the company, and not in any personal capacity." (Exhibit B at 4, ¶ 9).

69.     There was never any indication that Brown was purchasing property for personal use or acting in an individual capacity, a fact Binswanger and its executive management knew from the outset.

70.     As the Court further found, "Binswanger was aware from the very beginning that the subject real estate transaction was intended to be a manufacturing asset of HC Composites. Despite this knowledge, Binswanger's senior executive management approved naming Brown as a defendant individually, and asserting claims of civil conspiracy and UDTP against Brown individually." (Exhibit B at 3, ¶ 6).

71.     This decision was not inadvertent or negligent. It was a calculated and malicious escalation designed to increase leverage by subjecting Brown to personal financial exposure, reputational harm, and emotional distress.

72.     Binswanger and its executive management acted with malice by forcing Brown and HC Composites to expend substantial time, money, and resources defending an illegitimate lawsuit they knew was barred by law.

73.     The lawsuit was brought for one purpose and one purpose only: to apply maximum pressure through personal exposure and litigation costs in order to coerce Brown and HC Composites into capitulating and paying an illegal commission to which Binswanger knew it was not entitled.

**Defendants Institute a Frivolous and Malicious Lawsuit Against Plaintiffs**

74.     In furtherance of this unlawful goal, in September 2020, Defendant Binswanger Management Corp., through its wholly owned subsidiary, Binswanger Southern (N.C.), Inc., commenced a civil action in the Superior Court of Mecklenburg County, North Carolina, captioned *Binswanger Southern (N.C.), Inc. v. Camping World Holdings, Inc., et al.*, Case No. 21 CVS 906.

75.     The use of Binswanger Southern (N.C.), Inc., as the nominal plaintiff in that action did not reflect independent decision-making by that entity, but rather, served as a litigation vehicle through which Defendants' Pennsylvania-based executives implemented and carried out their strategy to exert leverage, inflict harm and coerce payment through abusive litigation tactics.

76.     Binswanger Southern (N.C.), Inc. is a shell corporation that is wholly owned, operated, maintained, dominated, and controlled by Defendant Binswanger Management Corp., with its executive offices and all decision-making authority located in Philadelphia, Pennsylvania. All operations, policies, financial decisions, and litigation strategy, including the decision to

initiate, prosecute, and appeal the underlying action, were dictated entirely by Binswanger Management Corp. and its senior executives in Philadelphia, including Defendant David Binswanger.

77.     In the underlying action, Binswanger sued Camping World Property, Inc. and Camping World Holdings, Inc., HC Composites, and Brown individually, claiming it was owed a six percent commission on the sale due to its prior efforts to introduce the parties.

78.     In filing this lawsuit, Binswanger knowingly abused the judicial process by asserting claims against HC Composites L.L.C. and Andrew Brown that were factually baseless and foreclosed as a matter of law .

79.     This meritless action was commenced with the full knowledge, authorization, approval, and encouragement of senior management at Binswanger Management Corp., including Defendant David Binswanger, who participated in and approved the decision to pursue the litigation as part of Binswanger's effort to extract a commission it knew it had not earned and was not legally entitled to recover.

**Defendants Name Brown Individually Without Any Lawful Basis for Doing So**

80.     In a transparent effort to maximize pressure and force Plaintiffs to settle, Defendants named Andrew Brown personally as a defendant. They did so despite the absence of any legal or factual basis for individual liability, and with full knowledge that the alleged conduct occurred solely in his corporate capacity and provided no basis to pierce the corporate form.

81.     As the Court found at trial, "Binswanger failed to offer any credible, factual basis to support naming Brown individually." (Exhibit B at 3, ¶ 8).

82.     Defendants knew that Andrew Brown was only acting for the company he founded, HC Composites.

83.    Defendants knew that there was never any indication that Brown was buying property for his personal use or acting in his personal capacity.

84.    As the Court concluded: "Based on the evidence presented, there was no factual basis to justify or support Binswanger's naming of Brown as an individual defendant and assertion of claims against Brown individually." (Id. at 4, ¶ 11).

**Defendants Escalate the Litigation by Adding Inflammatory and Damaging Fraud Claims**

85.    Defendants further intensified the pressure by asserting inflammatory, and damaging claims that Brown had engaged in Unfair and Deceptive Trade Practices ("UDTP") and participated in a civil conspiracy to defraud Defendants out of an alleged six percent (6%) commission fee to which Defendants knew they were not entitled.

86.    Binswanger further claimed that Camping World, HC Composites, and Brown engaged in a civil conspiracy, as well as Unfair and Deceptive Trade Practices within the meaning of North Carolina General Statute § 75-1.1, by "secretly negotiating" and then closing the real estate transaction without paying a commission to Binswanger.

87.    These claims were utterly baseless and destined to fail. They were asserted for the improper purpose of coercing capitulation and extracting a settlement, rather than seeking any legitimate vindication of Binswanger's rights.

**Binswanger's Executive Management's Direct Involvement and Approval**

88.    The frivolous and malicious litigation against Brown individually was not the work of a rogue employee or local office—it was planned, approved, and directed by Binswanger's senior executive management in Philadelphia, Pennsylvania.

89.    The uncontroverted testimony at trial by Binswanger's designated corporate representative confirmed that senior management at Binswanger, including CEO David

Binswanger, knew Mr. Brown was going to be sued individually and personally approved Mr. Brown being sued as an individual in this lawsuit.

90.     Binswanger's corporate representative confirmed that he spoke to executive management and told them what was being filed in the name of Binswanger, that Binswanger was filing claims against Mr. Brown individually for conspiracy and deceptive trade practices, and that executive management approved these allegations.

91.     Binswanger's corporate representative admitted that Binswanger was charging Mr. Brown with engaging in what it considered to be an unethical manner of business, and that executive management who authorized this lawsuit was charging Mr. Andrew Brown individually with conducting business in an unethical manner.

92.     Binswanger's corporate representative identified David Binswanger as the chief executive officer and executive manager of Binswanger.

93.     As the Court found, "Binswanger was aware from the very beginning that the subject real estate transaction was intended to be a manufacturing asset of HC Composites. Despite this knowledge, Binswanger's senior executive management approved naming Brown as a defendant individually, and asserting claims of civil conspiracy and UDTP against Brown individually." (Exhibit B at 3, ¶ 6).

94.     The Court further found that "Binswanger and its executive management authorized bringing the instant allegations and claims for relief, specifically its UDTP claim for relief, against HC Composites and Brown individually, despite its knowledge that Binswanger failed to obtain the written agreement required under North Carolina law to collect a real estate commission." (Id. at 7, ¶ 31).

95.     As the Court determined, "there was never any legitimate basis for Binswanger's executive management to approve initiating UDTP and civil conspiracy claims for relief against the HC Composites Defendants or to make any of its frivolous and malicious allegations against Brown individually." (Id. at 4, ¶ 10).

96.     David Binswanger knew that Brown had acted solely in his corporate capacity and that there was no basis to name him individually or to assert fraud-based claims against him personally.

97.     Notwithstanding this knowledge, David Binswanger personally authorized and directed the filing and prosecution of claims against Brown individually for the improper purpose of coercing payment and inflicting personal harm.

98.     In doing so, David Binswanger acted outside the scope of his legitimate corporate authority and engaged in individual tortious conduct.

**Plaintiffs Are Forced to Defend Against These Baseless Claims for Two Years**

99.     As a direct result of Defendants' false allegations, Plaintiffs were forced to defend themselves against these baseless claims for two years in active litigation.

100.    During that period, Defendants subjected Plaintiffs to extensive written discovery, document production, depositions, and motion practice.

101.    Binswanger executive management, operating from Philadelphia, first planned and then carried out this attack over a continuous period that exceeded two years.

102.    Brown was required to expend enormous amounts of time preparing for and attending depositions, responding to discovery requests, reviewing voluminous documents, consulting with counsel, and attending court proceedings.

103.    HC Composites was forced to divert company resources, including personnel time and financial resources, away from its core business operations to defend against claims that Defendants knew or should have known were meritless.

104.    The litigation imposed a substantial financial burden on Plaintiffs, requiring them to retain experienced counsel and pay significant legal fees to defend against allegations that the Court ultimately found to be "per se frivolous and malicious."

105.    The emotional and psychological toll on Brown was severe, as he faced the prospect of personal liability for allegations of fraud, conspiracy, and deceptive trade practices—claims that threatened not only his personal assets but also his professional reputation built over two decades.

106.    For more than two years, Defendants continuously pursued claims they knew were baseless. They never offered any credible factual or legal justification for suing Brown individually and knowingly pressed allegations that were squarely barred by North Carolina law.

**The Trial Court Finds that Binswanger's Claims Were Brought "Frivolously and Maliciously"**

107.    The matter ultimately proceeded to a bench trial on October 24, 2022, before the Honorable Steven R. Warren in the Superior Court of Mecklenburg County.

108.    Undeterred by Binswanger's intimidation tactics, Andrew Brown refused to capitulate to Defendants' extortionate demands and instead took Binswanger to trial to defend his reputation and his company.

109.    After considering the trial evidence and post-trial submissions, the Court found against Defendants on every claim alleged.  Specifically, the Court found that Binswanger had failed to prove any entitlement to a commission, had no reasonable expectation of payment, was not the procuring cause of the transaction, and was statutorily barred from recovery in the absence of a written agreement.

110.    Further, the Court concluded that Binswanger's claims were frivolous, malicious, and brought without any basis in law or fact. See generally Exhibit A (Order of the Honorable Steven R. Warren, Special Superior Court Presiding, dated November 7, 2022).  The Court emphatically rejected each and every claim brought by Binswanger, as detailed below.

**The Court Finds that Binswanger's UDTP Claim was Frivolous and Malicious.**

111.    In its final Judgment dismissing Binswanger's UDTP claim, the Court expressly found that the claim was "brought frivolously and maliciously." (Exhibit A at 43, Judgment ¶ 2).

112.    The Court ruled that "Binswanger knew or should have known that its UDTP claim for relief was frivolous, and Binswanger brought its UDTP claim for relief maliciously." (Exhibit B at 14, ¶ 8).

113.    The Court also found that Binswanger "did not merely fail to prevail" on its UDTP claim, but that "even after a full course of discovery and trial, Binswanger was unable to demonstrate any competent evidence supporting its claim." (Exhibit B at 14, ¶ 11).

114.    The Court found no credible evidence to support Binswanger's UDTP allegations and ruled that, even if the allegations were assumed true, they did not constitute an unfair trade practice because they were barred by G.S. § 93-13. (Exhibit B at 8, ¶ 39).

115.    The Court further found that neither Brown nor HC Composites engaged in any "deceptive" conduct prohibited by the UDTPA and, to the contrary, that Binswanger's own conduct -- specifically its attempts to circumvent governing statutes -- "possess[d] the tendency or capacity to mislead, or create[d] the likelihood of deception." (Exhibit A at 39, ¶ 36).

116.    The Court further held that permitting Binswanger to recover under the UDTPA would be "substantially injurious to consumers" and would "offend[] established public policy," because any such recovery would violate the governing statutes. (Exhibit B at 9, ¶ 35).

117.    As the Court explained, Binswanger's "sophistication in commercial real estate transactions," its prior dealings with HC Composites, and "a good faith evaluation of the facts available to it before filing this civil action"—including facts within its own records and the knowledge of its own executives—"should have demonstrated to any reasonable person that it was wholly inappropriate to charge the HC Composites Defendants with allegations under the UDTP." (Exhibit B at 3, ¶ 4).

118.    The Court further emphasized that "as a principal matter, the apparent lack of merit would begin with Binswanger knowing it had not itself followed North Carolina law requiring a contract to recover a real estate commission, and that the Camping World Defendants and the HC Composites Defendants were legally permitted to hire another agent." (Id.).

119.    The Court concluded that Binswanger's pursuit of its UDTP claim "unnecessarily complicated the case and increased the scope, necessity, and expense of Defendant's defense." (Exhibit B at 14, ¶ 11).

120.    With respect to the UDTP claim asserted against Brown personally, the Court found that this claim too was frivolous and malicious, and unsupported by any competent evidence.

121.    The Court further found that "the evidence utilized by Binswanger to support any claim against Brown as a defendant, based on his ultimate decision-making authority, was per se frivolous and malicious." (Exhibit B at 3, ¶ 4).

**The Court Rejects Binswanger's Specious Civil Conspiracy Claim**

122.    Binswanger had also asserted a civil conspiracy claim, alleging that the HC Composites Defendants engaged in a conspiracy to deprive it of a commission.

123. Specifically, Binswanger had claimed that the HC Composites Defendants engaged in both civil conspiracy and UDTP by "secretly negotiating" and closing the real estate transaction without paying Binswanger a commission.

124. However, the Court emphatically rejected this claim. Specifically, the Court found no credible evidence that Brown and Brown's father conspired to hire Michael Overton, or that Overton was hired to prevent HC Composites from engaging Binswanger.

125. In the absence of any evidence to prove a conspiracy, Binswanger abandoned this claim at the start of trial. As the Court noted, "On the morning of trial, Binswanger announced it was no longer prosecuting its claim for civil conspiracy against the HC Composites Defendants." Yet "Binswanger's attorney stated in his opening statement that a civil conspiracy existed between Brown and his father to hire Michael Overton to conceal the HC Composites Defendants' decision to exclude Binswanger from receiving its purported commission on the sale of the Staton Road Property." However, "no evidence supporting any such conspiracy was presented at trial." (Exhibit B at 2, ¶ 2).

126. Binswanger's abandonment of the claim at trial further confirmed that it lacked any evidentiary support from the outset. Because Binswanger failed to prosecute the claim and presented no supporting evidence, the Court dismissed the civil conspiracy claim with prejudice.

**The Court Rejects Defendants' Attempt to Circumvent North Carolina Law by Asserting an Unjust Enrichment Claim**

127. Defendants also attempted to recover a commission through claims of unjust enrichment and quantum meruit.

128. However, the Court emphatically rejected these baseless claims, finding that Binswanger was statutorily barred from recovery in the absence of a written agreement.

129.    As the Court concluded, "Binswanger cannot recover under a theory of quantum meruit and/or unjust enrichment because any award of damages under this theory would circumvent and undermine the statutory mandate of a valid contract, thereby permitting Binswanger to obtain a commission payment in violation of both the law and public policy." (Exhibit A at 35-36, ¶ 21).

**The Court Sanctions Binswanger for its Frivolous and Malicious Conduct**

130.    In a separate opinion dated December 13, 2022, the Court sanctioned Binswanger and ordered them to pay over $100,000 in attorneys' fees and costs.

131.    In so holding, the Court found that Defendants' decision to file a lawsuit against Brown and HC Composites was "wholly irresponsible, reckless, frivolous, and malicious." (Exhibit B at 14, ¶ 13).

132.    The Court ruled that Defendants "knew or should have known" that its civil action against Plaintiffs was "frivolous and malicious." (Exhibit B at 9, ¶ 43).

133.    The Court further ruled that the claims against Brown personally were "per se frivolous and malicious." (Exhibit B at 3, ¶ 4).

134.    The Court further found that "this lack of substance was readily apparent within Binswanger's own presentation of evidence, or lack thereof, at trial." (Exhibit B at 3, ¶ 4).

135.    With respect to the claims brought against Brown individually, the Court found that there was no factual basis to justify or support Binswanger's naming of Brown as an individual defendant and assertion of claims against Brown individually. (Exhibit B at 4, ¶ 11).

136.    Rather, "the evidence utilized by Binswanger to support any claim against Brown as a defendant, based on his ultimate decision-making authority, was per se frivolous and malicious." (Exhibit B at 3, ¶ 4).

137.    In so holding, the Court emphasized that "All CEOs have governance authority, and every company is made up of individuals where some person ultimately has to be able to make a final decision." (Exhibit B at 3, ¶ 4).

138.    The Court found that "had Binswanger made a reasonable evaluation of its rights under North Carolina law, it never should have filed any civil action against any party to this transaction." To use these events "to justify outlandish claims of civil conspiracy, UDTP, and the personal liability of HC Composites' President is beyond the limits of reasonable advocacy and should be publicly discouraged." (Exhibit B at 3, ¶ 4).

139.    In sum, the Court found that "[I]t was wholly irresponsible, reckless, frivolous, and malicious for Binswanger and its executive management to approve filing these claims for relief against HC Composites, and even more so against Brown in his individual capacity." (Exhibit B at 14, ¶ 13).

**Defendants File a Meritless Appeal Before Ultimately Dismissing It**

140.    Notwithstanding the trial court's unequivocal findings and imposition of sanctions, Defendants refused to accept the judgment and instead prolonged the proceedings by filing an appeal.

141.    Specifically, on December 12, 2022, Defendants appealed the judgment entered by the Honorable Steven R. Warren, Superior Court Judge.

142.    Defendants filed this notice of appeal not to have an adjudication on the merits, but rather, for the improper purpose of delaying final resolution, dragging out the proceedings further and coercing Plaintiffs to settle the case.  However, Defendants' delay tactics ultimately failed.

143.    On January 25, 2024, after having forced Plaintiffs to defend themselves against these baseless false claims for over four years, Defendants voluntarily dismissed the appeal, constituting a final favorable termination of the lawsuit filed by Binswanger.

144.    Defendants' voluntary dismissal confirmed that Binswanger's entire lawsuit—and their continued prosecution of it through appeal, lasting four years in total—was unjustified from its inception.

145.    Plaintiffs' causes of action herein did not accrue until the final favorable termination took place on January 25, 2024. This action is being filed within two years of the date when Plaintiffs' causes of action accrued, and it is therefore timely.

**The Egregious Conduct of Binswanger Warrants the Imposition of Punitive Damages**

146.    Binswanger's conduct in this lawsuit against Brown and HC was not only an illegal use of the judicial system, but was also egregious, unconscionable, and reprehensible, warranting the imposition of punitive damages to punish Defendants and deter any repetition of such misconduct in the future.

147.    This conclusion is all the more warranted because the Court specifically found that Binswanger and its executive management engaged in malicious conduct and frivolous litigation against Mr. Brown and HC Composites. That conduct was directed from Pennsylvania.

148.    In reaching that determination, the Court emphasized Binswanger's sophistication and experience, finding that "Binswanger's sophistication in commercial real estate transaction, its background with the HC Composites Defendants, and a good faith evaluation of the facts available to it before filing this civil action, i.e., evidence Binswanger possessed within its own records and the knowledge of its own executives, should have demonstrated to any reasonable

person that it was wholly inappropriate to charge the HC Composites Defendants with allegations under the UDTP." (Exhibit B at 3, ¶ 4).

149.    As the Court further explained, the absence of any legitimate basis for Binswanger's claims was apparent from the outset, noting that "as a principal matter, the apparent lack of merit would begin with Binswanger knowing it had not itself followed North Carolina law requiring a contract to recover a real estate commission, and that the Camping World Defendants and the HC Composites Defendants were legally permitted to hire another agent." (Exhibit B at 3, ¶ 4).

150.    Against that backdrop, the Court made clear that Binswanger's escalation of the dispute into fraud-based claims was indefensible, emphasizing that "while there is an arguable claim that the allegation of quantum meruit was not itself frivolous, the decision to use these circumstances to make serious and damaging accusations of UDTP against a business and its executive manager simply cannot be justified." (Exhibit B at 3, ¶ 4).

151.    The Court further found that Binswanger compounded this misconduct by pursuing those allegations not only against the corporate entity, but against Brown personally, holding that "Binswanger prosecuted these allegations not only against the corporate entity which acquired the property, but also against Brown, the company's President and CEO, personally. The evidence utilized by Binswanger to support any claim against Brown as a defendant, based on his ultimate decision-making authority, was per se frivolous and malicious." (Exhibit B at 3, ¶ 4).

152.    In stark contrast to Binswanger's conduct, the Court expressly found that "The Defendants acted in a reasonable and ethical manner. Only Binswanger failed to follow any part of North Carolina law on real estate contracts." (Exhibit B at 8, ¶ 40).

153.    Ultimately, the Court concluded that "based on the evidence presented, there was no factual basis to justify or support Binswanger's naming of Brown as an individual defendant and assertion of claims against Brown individually." (Exhibit B at 4, ¶ 11).

154.    Taken together, these findings establish far more than negligence or poor judgment. They demonstrate a deliberate, knowing, and malicious misuse of the judicial system by a highly sophisticated commercial real estate firm that fully understood the governing law, knew its claims were barred, and nevertheless chose to proceed in order to exert leverage, inflict harm, and coerce payment.

155.    Because this misconduct was intentional, calculated, and directed by executive management, punitive damages are not merely appropriate—they are necessary to punish Binswanger for its abuse of the courts and to deter it and similarly situated actors from repeating this conduct in the future.

**Binswanger's Unlawful Actions Cause Substantial Damages to Plaintiffs**

156.    As a direct and proximate result of Defendants' unlawful actions, Plaintiffs have suffered substantial, foreseeable, and continuing damages.

157.    As a threshold matter, Brown incurred significant attorneys' fees, costs, and litigation expenses defending against Defendants' frivolous and malicious lawsuit, including fees exceeding $100,000 as awarded by the North Carolina court, together with significant additional defense attorneys' fees and costs that were never reimbursed.

158.    Brown was also required to devote hundreds of hours away from his business and executive responsibilities to address and defend the litigation.

159.    Brown was forced to divert substantial time, attention, and resources from the management and growth of his company to his material detriment.

**Brown Suffered Severe Emotional Distress**

160.    Brown has suffered severe and profound emotional distress as a direct and proximate result of Defendants' conduct.

161.    The impact of this ordeal was visibly and unexpectedly demonstrated when Brown broke down while testifying at trial.

162.    This emotional response underscored the extraordinary stress, humiliation, and anxiety imposed by Defendants' frivolous and malicious accusations.

163.    This distress has caused substantial disruption to Brown's personal life, professional functioning, and overall well-being.

**Brown Suffered Severe Reputational Harm and Impairment of Future Business Opportunities**

164.    Brown suffered severe and lasting reputational harm as a direct and proximate result of being publicly accused of fraud, conspiracy, and unfair trade practices.

165.    As a direct and foreseeable consequence of Defendants' misconduct, the allegations asserted against Brown individually created permanent disclosure obligations in connection with financing transactions, corporate governance, lending relationships, mergers, acquisitions, and potential public offerings.

166.    The deception, conspiracy, unfair trade practices, and related fraud-based allegations asserted against Brown individually created permanent disclosure obligations that will follow Brown for the rest of his professional life.

167.    To a reasonable degree of probability, these disclosure obligations will have material and detrimental consequences on Brown's future business plans.

168.    To a reasonable degree of probability, these disclosure obligations substantially impair Brown's ability to pursue a sale or acquisition by a public company.

169.    To a reasonable degree of probability, these disclosure obligations substantially impair Brown's ability to participate post-sale in executive or board positions in a publicly traded company.

170.    To a reasonable degree of probability, these disclosure obligations substantially impair Brown's ability to otherwise be fully involved in transactions involving public-company counterparties.

171.    To a reasonable degree of probability, these disclosure obligations substantially impair Brown's ability to take his own company, HC Composite L.L.C., public.

172.    All of these opportunities have been substantially impaired by the existence of these allegations notwithstanding Brown's complete vindication.

173.    These impairments are the direct and proximate result of Defendants' frivolous and malicious litigation.

**The Permanent Impact on Brown's Professional Life**

174.    In the modern compliance, regulatory, and governance environment, Defendants' allegations of fraud and conspiracy against Mr. Brown will, to a reasonable degree of probability, materially and permanently impair his ability to serve as an executive or director, to sit on boards of directors, to assume post-transaction leadership roles, or to participate in strategic exits.

175.    Such allegations routinely trigger enhanced diligence, disclosure obligations, insurance exclusions, and heightened scrutiny by lenders, underwriters, regulators, and activist shareholders.

176.    To a reasonable degree of probability, such allegations can independently disqualify or materially disadvantage an individual from board service or senior management roles notwithstanding complete vindication on the merits.

177.    Had the defendants not engaged in malicious, wrongful, and intentional attacks on Mr. Brown and HC Composites, Mr. Brown would justifiably have been able to answer "No" to any questions about whether he had been sued for fraud, deception and fraudulent business practices, or illegal trade practices.

178.    Instead, for the rest of his professional life, Mr. Brown will have to answer "yes" to these questions and engage in explanations about this background.

179.    To a reasonable degree of probability, this will create an environment in which a publicly traded company might believe his explanation, after going through full due diligence (an event which should never have had to happen), but where they still decline his participation simply to avoid future distractions over his background.

180.    These professional limitations are the direct and proximate result of Defendants' malicious prosecution.

**Binswanger's Pattern and Practice of Unlawful Commission Litigation**

181.    Binswanger's malicious prosecution of Brown was not an isolated incident, mistake, or aberration.

182.    Rather, it was part of a longstanding and recurring pattern and practice in which Binswanger initiates litigation seeking to recover real estate commissions it did not earn and to which it had no legal entitlement.

183.    This pattern includes cases where no written contract existed, where the contract had expired, where Binswanger was not the procuring broker, and where Binswanger was not properly licensed.

184.    Courts across multiple jurisdictions have repeatedly rejected Binswanger's commission claims under these circumstances, finding that Binswanger lacked a contractual or statutory basis for recovery and was barred as a matter of law from obtaining any commission.

185.    In numerous cases, Binswanger nevertheless pursued litigation aggressively, asserting theories such as unjust enrichment, quantum meruit, or implied contract in an effort to extract payment notwithstanding the absence of a lawful right to compensation.

186.    For example, in <u>Binswanger Companies v. Merry-Go-Round Enterprises</u>, 258 B.R. 608 (D. Md. 2001), aff'd, 24 F. App'x 135 (4th Cir. 2001), Binswanger sought to recover a commission despite having no brokerage agreement and despite not being licensed in the relevant jurisdiction, and the bankruptcy court, district court, and Fourth Circuit all rejected Binswanger's claims, finding that Binswanger was not the procuring broker, had never been formally employed, and was legally barred from recovering any commission.

187.    In <u>Binswanger Southern (N.C.), Inc. v. Textron, Inc.</u>, 860 S.W.2d 862 (Tenn. Ct. App. 1993), Binswanger attempted to recover a six-percent commission through its Southern subsidiary even though the subsidiary was not a party to the brokerage agreement and the contracting entity was not licensed, and the Tennessee Court of Appeals held that Binswanger's conduct violated the state's real estate licensing statute, rendered the agreement illegal and unenforceable, and barred any recovery by either entity as a matter of law.

188.    Similarly, in <u>Binswanger Co. v. National Industrial Services, Inc.</u>, 1991 U.S. Dist. LEXIS 10148 (E.D. Pa. July 17, 1991), Binswanger pursued commission claims after its exclusive listing agreement had expired, and although a jury initially returned a verdict in Binswanger's favor, the district court entered judgment notwithstanding the verdict, holding that the evidence was legally insufficient and that Binswanger was not entitled to a commission as a matter of law.

189.    In <u>Binswanger v. Levy</u>, 311 Pa. Super. 41 (1983), Binswanger brought suit to recover a commission despite having no contract authorizing it to sell or broker the property, and the trial court concluded that Binswanger failed to state a cause of action because there was no express or implied agreement to pay a commission, a ruling the Superior Court largely affirmed.

190.    In <u>Binswanger Co. v. Rentar Industrial Realty Corp.</u>, 1985 WL 939 (N.D. Ill. Apr. 23, 1985), Binswanger sought to recover compensation under exclusive listing agreements despite not being licensed in Illinois, and the court held that the agreements were void and unenforceable under Illinois law and dismissed Binswanger's claims in their entirety.

191.    These cases—spanning multiple decades, jurisdictions, and corporate affiliates—demonstrate a deliberate and recurring business practice in which Binswanger initiates litigation to pursue commissions it knows, or should know, it is not legally entitled to recover.

192.    This history demonstrates that Binswanger has repeatedly used litigation as a business tactic to pursue commissions it knew—or should have known—it was not entitled to recover, often forcing defendants to incur substantial legal fees to defeat claims that were legally deficient from inception.

193.    This established pattern and practice is directly relevant to Defendants' intent, motive, and state of mind, and supports the imposition of substantial punitive damages to punish and deter Binswanger from continuing to engage in this unlawful conduct nationwide.

**<u>COUNT I</u>**
**WRONGFUL USE OF CIVIL PROCEEDINGS**
**(Dragonetti Act)**

194.    Plaintiffs incorporate by reference all facts alleged herein.

195.    Defendants initiated and continued civil proceedings against Brown.

196.    The proceedings terminated in Brown's favor on January 25, 2024, when Defendants voluntarily dismissed their appeal.

197.    Defendants lacked probable cause to assert claims for Unfair and Deceptive Trade Practices, quantum meruit, unjust enrichment, and civil conspiracy against Brown individually.

198.    As Judge Warren found, "It was wholly irresponsible, reckless, frivolous, and malicious for Binswanger and its executive management to approve filing these claims for relief against HC Composites, and even more so against Brown in his individual capacity." (Exhibit B at 14, ¶ 13).

199.    Defendants acted primarily for improper purposes, including coercing payment of a fee in excess of $300,000.00 to which they knew they had no lawful entitlement.

200.    As a direct and proximate result of Defendants' wrongful use of civil proceedings, Brown suffered substantial compensable damages, including but not limited to attorneys' fees, costs, loss of time, emotional distress, and severe reputational harm that will, to a reasonable degree of probability, materially impair his future professional opportunities.

201.    David Binswanger knowingly approved, encouraged, and consented to this conduct and is individually liable.

202.    David Binswanger stepped outside his legitimate role as a company executive when he directed the filing of a lawsuit which he knew or should have known was frivolous and prosecuted with malice, thereby engaging in individual tortious conduct for which he is personally liable.

## COUNT II
## ABUSE OF PROCESS

203.    Plaintiffs incorporate by reference all facts alleged herein.

204.    Defendants used legal process for purposes other than those for which it was designed, without probable cause or any legal justification for doing so.

205.    Defendants continued to pursue their baseless litigation claims for four years until they were forced to abandon their appeal on January 25, 2024.

206.    During this four-year period, Defendants knowingly, deliberately, and willfully misused litigation tools to coerce payment and apply improper pressure on Plaintiffs.

207.    As a direct and proximate result of Defendants' abuse of process, Brown suffered substantial damages, including but not limited to attorneys' fees, costs, loss of time, emotional distress, and severe reputational harm that will, to a reasonable degree of probability, materially impair his future professional opportunities.

208.    David Binswanger knowingly approved, encouraged, and consented to this misuse of process.

209.    David Binswanger stepped outside his legitimate role as a company executive when he directed and approved the continuation of frivolous litigation prosecuted with malice for the improper purpose of coercing payment, thereby engaging in individual tortious conduct for which he is personally liable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Andrew Brown and HC Composites LLC, Inc. respectfully request that this Court grant them the following relief against Defendants, jointly and severally, as follows:

(a) Special damages including but not limited to economic loss,

(b) Compensatory damages including but not limited to emotional pain and suffering, mental anguish, and loss of reputation,

(c) Punitive damages in an amount to be determined at trial,

(d) Attorney's fees and costs, and

(e) All other relief this Court deems just and proper.

Dated: New York, New York
        January 23, 2026

Respectfully submitted,

**O'BRIEN COLEMAN & WRIGHT, LLC**


**/s/ Alec B. Wright**
Alec B. Wright, Esq.
*Attorneys for Plaintiffs*
116 Blvd of the Allies
Pittsburgh, Pennsylvania 15222
Tel. No.: (412) 260-1662
alec@ocwjustice.com

**JON L. NORINSBERG, ESQ., PLLC**


Jon L. Norinsberg, Esq.
*Attorneys for Plaintiffs*
825 Third Avenue, Ste. 2100
New York, New York 10022
Tel. No.: (212) 791-5396
jon@norinsberglaw.com